**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHEIRYS BREDEMEIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15 C 7514** |
| | ) | |
| **ROBERT WILKIE,**[1] **Secretary, U.S.** | ) | |
| **Department of Veterans Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Sheirys Bredemeier has sued her employer, the Secretary of Veterans Affairs (VA), for alleged violations of Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. Specifically, Bredemeier alleges harassment / hostile work environment in violation of Title VII (count 1), failure to accommodate in violation of the Rehabilitation Act (count 2), and discrimination, hostile work environment, and retaliation in violation of the Rehabilitation Act (count 3). Bredemeier has moved for summary judgment on her failure to accommodate claim, and the Secretary has moved for summary judgment on all claims. For the reasons stated below, the Court grants summary judgment in favor of the Secretary on the hostile work environment and "increased scrutiny" claims in count 3 but otherwise denies both parties' motions.

---

[1] Secretary Wilkie is substituted as Secretary of Veterans Affairs pursuant to Federal Rule of Civil Procedure 25(d).

**Background**

The Court takes the following facts from the parties' Local Rule 56.1 submissions. The facts are undisputed unless otherwise noted. In determining what is disputed, the Court focuses "not only on whether the parties profess to dispute a fact, but also on the evidence the parties offer to support their statements." *Zitzka v. Village of Westmont*, 743 F. Supp. 2d 887, 899 n.2 (N.D. Ill. 2010). When the Court cites "as undisputed a statement of fact that a party has attempted to dispute, that reflects [a] determination that the evidence does not show that the fact is in genuine dispute." *Id.*

**A. Alleged failure to accommodate**

Bredemeier has worked for the VA since 1999. From 1999 through 2006, she worked as a pharmacy technician. In 2006, Bredemeier permanently injured her right hand. She has difficulty using that hand to type or complete other repetitive tasks as a result of the injury. Due to permanent medical restrictions resulting from her injury, from 2007 until February 2016, Bredemeier worked as a patient services assistant in the pharmacy so she would not have to use her hands to manually fill prescriptions. According to Bredemeier, the condition of her right hand nonetheless continued to deteriorate because she still had to use it to type in order to fulfill her duties as a patient services assistant.

Aside from offering Bredemeier the limited-duty patient services assistant position, the VA did not take any additional action to accommodate her disability between 2007 and 2010.[2] In late 2010, Bredemeier requested and received a number

---

[2] Although the Secretary disputes this, the evidence he cites in support does not pertain to the 2007-2010 time frame. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement ¶ 10.

of accommodations from the Computer / Electronic Accommodations Program (CAP), a Defense Department program that provides assistive devices to VA employees. Among the accommodations Bredemeier received were voice recognition software called Dragon NaturallySpeaking (which allowed her to dictate rather than type), a Plantronics SC55 Headset system, a Workrite Poise Monitor Arm, Easy Cat Touchpad, and a Goldtouch keyboard and keypad. Bredemeier subsequently asked to be moved to a different, quieter work area, because the background noise near her workstation interfered with the dictation software. In response, the VA moved Bredemeier's workstation to another part of the same work area, but Bredemeier testified during her deposition that it was no quieter there. *See* Pl.'s Rule 56.1 Statement, Ex. 3 (Bredemeier Dep.) at 32:4-33:9. Bredemeier wanted to move to the back of the pharmacy where it was quieter, but she says she was told that "there was no place for them to set up [her] equipment, and there was no quieter place in the pharmacy. And if [she] didn't like it, to leave." *Id.* at 33:9-33:17.

Despite the background noise, Bredemeier successfully used the dictation software to perform her duties from December 2010 until September 2011. Bredemeier contends that in September 2011, the VA moved her into an open waiting area, where she performed triage technician duties. She alleges that the VA boxed up all her accommodations at this time without consulting her. Secretary disputes these facts; according to the Secretary, Bredemeier accepted a position as a limited-duty patient services assistant in the outpatient pharmacy department in November 2012, but she never held the position of triage technician. The Secretary does not genuinely dispute, however, that Bredemeier's workstation was moved and her accommodations boxed up

in September 2011. Although the Secretary contends that Bredemeier's duties were limited to non-typing duties as of at least November 2012, Bredemeier says that she still needed to type to perform her job duties.

Bredemeier repeatedly requested accommodations at her new workstation. *See, e.g.*, Def.'s Rule 56.1 Statement, Ex. 2 (Lynx Decl.), Ex. A at 000090, 000092. As of December 2012, e-mails suggest that the VA had installed dictation software on Bredemeier's computer, but her phone and the headset that was supposed to work with the phone and the computer had not been installed. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement, Ex. 16 at 1. Additional e-mails from 2013 through 2016 reflect ongoing problems with Bredemeier's dictation software and related equipment, as well as efforts by VA staff to address them. *See* Lynx Decl., Ex. A at Bates No. 143-146, 148-149, 151-152, 157-159, 208-213, 217-219, 226-227, 232-237.

During the period from 2012 through 2016, e-mails between Bredemeier and various VA employees indicate that the VA continued to attempt to accommodate Bredemeier's disability. In July 2012, Bredemeier requested an ergonomically designed workstation that included dictation software. The VA subsequently conducted an ergonomic evaluation on her workstation, ordered a new ergonomic desk, and provided her with the dictation software (though Bredemeier maintains that the software did not function properly). The VA also worked to address problems with Bredemeier's wireless headset during this time and again from 2014 through 2016. In January 2014, the VA attempted to find another location for Bredemeier's workstation after she complained that it was too noisy; in March 2014, the VA made plans to reinstall her computer, phone, and other equipment in a new area. By that time, the VA had also installed a

device on Bredemeier's computer that allowed her to switch in one click from talking to patients on the phone to communicating with her computer. When Bredemeier complained in March 2014 that she had neck and shoulder pain due to having to use a phone that was not ergonomically designed, she was told that the VA was awaiting the ergonomic recommendations for her new work area, and she was granted sick leave. In September 2015, the VA offered, and Bredemeier accepted, a transitional duty assignment that was not supposed to involve use of her right arm. Bredemeier contends, however, that she was still required to type.

In February 2016, Bredemeier was promoted to the position of advanced medical support assistant within Patient Administration Services. The VA alleges that when Bredemeier started this new position, she did not immediately notify her supervisor or the department of her medical restrictions and necessary accommodations. In a May 2016 letter to the Department of Labor, a VA human resources specialist inquired into (1) whether Patient Administration Services had to accommodate Bredemeier's medical restrictions even though she did not disclose them during the hiring process and (2) whether the VA should place Bredemeier into the reasonable accommodations process. *See* Def.'s Resp. to Pl.'s Rule 56.1 Statement, Ex. 14 (Brown Decl.), Ex. 4. The letter further stated that because Patient Administration Services was not able to find a fully functional position for Bredemeier at that time due to her medical restrictions, she had been placed in a temporary position. Bredemeier accepted another transitional duty assignment in April 2017. The memorandum regarding this assignment acknowledges the need for "Dragon Software and quiet area to minimize typing." Brown Decl., Ex. 5. According to Bredemeier, the VA still had not properly installed her dictation software or

provided her with the necessary assistive devices in her new position as recently as February 2018.

**B.     Alleged retaliation by Chief of Pharmacy Lynx**

In July 2012, Bredemeier, Chief of Pharmacy Donald Lynx, and a union representative participated in a mediation to discuss accommodations for Bredemeier's disability.  Bredemeier stated in her declaration that during this mediation, Lynx "yelled that the pharmacy was a place in need of young people who could use both hands who were physically able to handle the job."  Pl.'s Resp. to Def.'s Rule 56.1 Statement, Ex. 1 (March 3, 2018 Bredemeier Decl.) ¶ 56.  Bredemeier alleges that after the mediation, Lynx subjected her to increased scrutiny, informally monitoring her workstation, phone usage, and even her bathroom breaks.  She alleges that Lynx further retaliated against her by filing, in April 2013, a VA police report in which she says he falsely accused her of stealing medication.  Lynx filed the report after a homecare nurse informed the VA pharmacy that one of the nurse's patients had been using a medication prescribed for someone else; that patient was Bredemeier's father-in-law.  According to the Secretary, VA police simply interviewed Bredemeier during the investigation of the matter because she regularly picks up her father-in-law's medication from the VA and personally delivers it to him.  The investigative report states, however, that Lynx "reported to Police service . . . an employee he suspects [sic] taking pharmaceuticals from the pharmacy without proper authorization," and lists Bredemeier as the only suspect.  *See* Pl.'s Resp. to Def.'s 56.1 Statement, Ex. 12 at 1.  The matter was closed after an investigation, and no formal charges were ever brought against Bredemeier.

**C.     Alleged harassment by Kolbe / hostile work environment**

Bredemeier further alleges that she was repeatedly harassed by VA police officer Cary Kolbe from approximately 2010 until he left for another VA facility in 2017. Between 2009 and early 2010, Bredemeier and Kolbe exchanged a number of text messages, the contents of which indicated that they communicated with one another outside of work and had, at least for a time, a friendly relationship. According to Bredemeier, the relationship ultimately soured and Kolbe began to follow her throughout the Hines VA facility after she rejected his requests for dates and other advances.[3] He would stare at her while she was in her work area, follow her around, blow kisses at her, and stare at her while she was eating lunch in the cafeteria. Bredemeier stated in her declaration that Kolbe's behavior toward her made her uncomfortable and that she "considered it harassment." March 8, 2018 Bredemeier Decl. ¶ 33. Bredemeier's co-worker and friend Rena Gordon testified during her deposition that Kolbe would "stop and stare" at Bredemeier when she was eating in the cafeteria. Pl.'s Resp. to Def.'s 56.1 Statement, Ex. 4 (Gordon Dep.) at 74:2-74:3. According to Gordon, "[h]e just comes in and stares real briefly, like he's looking for something. But he never walks out with anything." *Id.* at 74:19-74:22. Bonnie Southall, another friend and co-worker, similarly testified that on several occasions, she noticed that Kolbe appeared near Bredemeier during lunch and made sure that he caught her eye. She testified that she had seen him "circle" their lunch table while looking at Bredemeier. Pl.'s Resp. to Def.'s

---

[3] The Secretary contends that these text messages undermine Bredemeier's harassment allegations by showing that she often initiated contact with Kolbe during that period. The Court need not examine the contents of these messages here because they are of little relevance regarding whether Kolbe harassed Bredemeier from approximately 2010 onward and they do not materially affect the outcome of the pending motions.

56.1 Statement, Ex. 5 (Southall Dep.) at 22:15-22:16. Bredemeier also stated in her declaration that Kolbe "showed up at [her] house once," "indicated . . . that he ran [her] license plates to find [her] address," and invited her to the movies. March 8, 2018 Bredemeier Decl. ¶ 34.

Bredemeier contends that she complained about Kolbe's behavior to James Runge, Assistant Chief of the Hines VA Police, in 2010 or 2011, but nothing changed— Kolbe continued to follow her around and stare at her. Bredemeier stated in her declaration that she found Kolbe's behavior "scary," especially because he had a gun and she knew that he had "threatened to kill" Michael Leonard, a VA criminal investigator. *Id.* ¶ 36. Bredemeier says she met with Runge, then-Chief Donald Gardiner, her union representative, and John Clifton from the Director's Office in 2012 and told them that Kolbe was still harassing her. Again, nothing changed.

According to Bredemeier, in May 2013, Kolbe circled her table while she was eating lunch with Southall in the cafeteria. Kolbe followed Bredemeier down the hall when she left, and Bredemeier says she heard Kolbe say something about her "perfect ass." *Id.* ¶ 39. Later that month, Bredemeier met with Chief of VA Police Gary Marsh to complain about Kolbe's behavior, including the recent incident in the cafeteria. She was accompanied by a patient and Southall, both of whom had witnessed Kolbe's behavior. She also met with Associate Director Daniel Zomchek to tell him that Kolbe was harassing her. Marsh spoke with Kolbe, but he was not disciplined, and nothing changed. On June 5, 2013, Bredemeier filed a VA police report accusing Kolbe of stalking and harassing her, but that did not put an end to Kolbe's behavior either. Bredemeier stated in her declaration that although she initially found Kolbe's behavior

merely "irritating," she ultimately found it "terrifying," because it continued no matter how much she complained.  *Id.* ¶ 49.  She often "would not even want to go to work for fear of seeing him," but as a widowed single mother she could not leave her job.  *Id.* ¶ 50.

Bredemeier alleges that Kolbe continued to harass her until he left the Hines VA campus around February 2017, when he was hired as Chief of Police at the Robert J. Dole VA Medical Center in Wichita, Kansas.  Shortly after Kolbe's arrival in Wichita, management received numerous complaints about him.  These complaints included sexual harassment allegations as well as allegations that Kolbe constantly followed a certain female VA police officer around the Dole campus.  Following an investigation into all of the allegations, Kolbe received a two-week suspension for conduct unbecoming of a federal employee and improper disclosure of personnel matters.  In October 2017, another female Dole VA employee complained about Kolbe making her feel uncomfortable.  In November 2017, following another investigation, the VA proposed Kolbe's removal based on conduct unbecoming of a federal employee and disrespectful conduct towards another employee.[4]  Kolbe resigned before he could be officially removed.

### D.    Procedural history

Bredemeier sought EEO counseling on May 8, 2013.  On June 17, 2013, she filed an EEO complaint alleging discrimination and hostile work environment based on the following incidents:

1. In 2009, Kolbe asked her out on a date;

2. In March 2012, Lynx scolded her for not working while she was talking on her

---

[4] None of the conduct described in the November 2017 letter of proposed removal was related to sexual harassment or stalking.

cell phone;

3. On May 4, 2012, Lynx issued Bredemeier a Letter of Inquiry because she was using the phone in her supervisor's office;

4. In July 2012, her assigned billing duties were removed;

5. In August 2012, Lynx approached her in the hall and waited for her to come out of the bathroom;

6. On May 7, 2013, Lynx stood behind her and watched her with an aggravated demeanor;

7. On May 8, 2013, management falsely accused her of stealing medication;

8. On May 12, 2013, her request for an accommodation was denied; and

9. On May 15, 2013, Kolbe harassed Bredemeier by continuing to walk back and forth in front of her while she was sitting in the cafeteria.

*See* Compl., Ex. 1 (Final Agency Decision) at 2-3. Bredemeier also alleged that she was discriminated against on the basis of sex, national origin, age, and disability when her request for an accommodation was denied on May 12, 2013.[5] In a May 2015 final agency decision, the Department of Veterans Affairs Office of Employment Discrimination Complaint Adjudication determined that Bredemeier had failed to prove that she was discriminated against as alleged. *Id.* at 14.

Bredemeier filed the present lawsuit in August 2015. She asserts the following claims in her complaint:

1. Harassment / hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1);

2. Failure to reasonably accommodate her disability in violation of the

---

[5] It is not clear from the record that anything specific—such as an express denial of a request for accommodation—happened on this date. It appears that Bredemeier may simply have decided that by May 2013, the VA had effectively denied her request for accommodations.

Rehabilitation Act, 29 U.S.C. § 794(a); and

3. Discrimination, hostile work environment, and retaliation in violation of the Rehabilitation Act.

*See* Compl. ¶¶ 12-34.  The Court notes that Bredemeier also refers to "retaliation" in count 1 of the complaint, but the only retaliation she alleges in that count is harassment by Kolbe, which Bredemeier characterizes as retaliatory because it began after she rejected his advances.  *See* Compl. ¶¶ 12-19; *see also* Pl.'s Resp. to Def.'s Mot. for Summ. J at 5 ("Though they were friendly at one point, after Ms. Bredemeier rejected Kolbe's continuing advances, he retaliated against her by stalking her throughout Hines.").  Such allegations do not form the basis of a Title VII retaliation claim.  In any case, Bredemeier does not characterize count 1 as a retaliation claim in her summary judgment briefs.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 1 ("Bredemeier . . . filed a three-count complaint" alleging that "1) from 2010 on Cary Kolbe, a Hines VA police officer, had subjected her to sexual harassment . . . ."); *id.* at 5 ("Count I of Ms. Bredemeier's complaint alleges she was subject to a hostile work environment based on her sex. . . ."); *id.* ("Title VII prohibits a sexually hostile or abusive work environment as it is a form of sex discrimination. . . .").  Bredemeier also states in the first paragraph of her complaint that she was alleging claims based on violations of the Age Discrimination in Employment Act of 1967 (ADEA) in addition to Title VII and the Rehabilitation Act, but she does not mention the ADEA anywhere else in her complaint or in her summary judgment briefs.  If Bredemeier ever intended to assert an ADEA claim, that claim has since been abandoned.

## Discussion

Bredemeier has moved for summary judgment on her failure to accommodate

claim (count 2). She argues that no reasonable jury could conclude that the VA has reasonably accommodated her because her dictation software has not been operational since September 2011. Accordingly, Bredemeier contends that she is entitled to summary judgment on count 2.

The Secretary has moved for summary judgment on all of Bredemeier's claims. With respect to count 1, the Secretary first contends that Kolbe's alleged conduct did not rise to the level of actionable harassment or create a hostile work environment. Even if it did, however, the Secretary argues that the VA is not subject to liability because it was not negligent in discovering or remedying the harassment. The Secretary also contends that summary judgment is warranted on count 2 because no reasonable jury could find that the VA did not reasonably accommodate Bredemeier's disability to the best of its ability. As for count 3, the Secretary contends that much of the complained of conduct cannot form the basis of a discrimination or retaliation claim because either (1) Bredemeier failed to exhaust her administrative remedies or (2) they do not constitute materially adverse employment actions (or both). The Secretary further argues that Bredemeier cannot prove that she suffered the alleged adverse employment actions because of her disability or a retaliatory motive.

Bredemeier responds that, at a minimum, there are genuine factual disputes that preclude a grant of summary judgment on counts 1 and 3 of the complaint. She argues in the alternative that "it would not be unreasonable for the court to *sua sponte* grant [her] summary judgment on those counts." Pl.'s Resp. to Def.'s Mot. for Summ. J at 5. If Bredemeier wanted to move for summary judgment on counts 1 and 3, she could have done so. In any event, it should be evident from the discussion below that

Bredemeier is not entitled to summary judgment on either of those claims.

The Court takes cross-motions for summary judgment one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party. *Steimel v. Wernert*, 823 F.3d 902, 910 (7th Cir. 2016). Summary judgment is appropriate only if the movant shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is not warranted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts must be cautious in applying the summary judgment standard to employment discrimination cases because such cases frequently turn on intent and credibility issues. *See Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Nonetheless, "the mere existence of *some* alleged factual dispute between the parties" is insufficient to defeat a motion for summary judgment. *Id.* (emphasis in original) (quoting *Anderson*, 477 U.S. at 247).

## A.    Title VII harassment / hostile work environment claim (count 1)

Title VII prohibits sexual harassment that is severe or pervasive enough to alter the conditions of employment. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 634 (7th Cir. 2009); *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016) (Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or [pervasive] to alter the conditions of the victim's employment and create an abusive working environment") (internal quotation marks and citation omitted). An employer may be held liable for the hostile work environment created by a co-worker's harassment of another employee if the employer was negligent in either

discovering or remedying the harassment. *Porter*, 576 F.3d at 636; *see also Bombaci v. Journal Cmty. Pub. Grp., Inc.*, 482 F.3d 979, 983 (7th Cir. 2007).

To survive summary judgment on a hostile work environment claim, Bredemeier must introduce "sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920. In evaluating hostile work environment claims, courts consider the totality of the circumstances. *Id.* Factors to consider include "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* Not all inappropriate behavior that has an adverse impact on the work environment and would make a reasonable employee uncomfortable rises to the level of actionable harassment. *See Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).

Although it is arguably a close call, when the totality of the evidence is viewed in the light most favorable to Bredemeier and all reasonable inferences are drawn in her favor, a reasonable jury could find that Kolbe's behavior was objectively offensive and severe and pervasive enough to create a hostile work environment. Stalking and threatening, intimidating, or demeaning conduct is prohibited by the Hines VA sexual harassment policy. Bredemeier alleges that sometime after summer 2010, Kolbe showed up at her house, indicated that he ran her license plates to find her address, and asked her to the movies. Although this appears to have been an isolated incident,

it is highly inappropriate behavior, and a reasonable person could certainly find it to be threatening, particularly when coming from a law enforcement officer. Bredemeier also alleges—and Southall and Gordon confirm—that Kolbe followed her around, stared at her, waved or blew kisses at her, and frequently appeared where she was working or eating for several years. It is difficult to judge how objectively offensive and physically threatening these acts were. But although Bredemeier does not allege that Kolbe ever touched her or that he ever verbally threatened her, a reasonable jury could conclude, based on the fact that Kolbe carried a weapon—which Bredemeier says contributed to her fear of him—and Bredemeier's allegations that he followed her around *for years*, that Kolbe's behavior was physically threatening. Although Bredemeier has no evidence that Kolbe's behavior materially affected her job performance—indeed, she stated in her declaration that she has "performed at or above the level of 'Fully Successful' on [her] performance evaluations while employed by the VA"—she has stated that it terrified her because it did not stop no matter how much she complained and that it made her not want to go to work. March 8, 2018 Bredemeier Decl. ¶¶ 29, 49. A reasonable factfinder viewing the facts in light most favorable to Bredemeier could conclude from this record that Kolbe's long-running harassment of her was severe or pervasive enough to alter the conditions of her employment such that it created a hostile work environment.

The Secretary next argues that the VA is not subject to liability for any hostile work environment created by Kolbe because it was not negligent in discovering or remedying the harassment. But Bredemeier has alleged that she complained to numerous VA police supervisors, Zomchek, and Clifton about Kolbe's behavior and

even filed a police report about it. Despite these complaints, Bredemeier asserts, Kolbe never stopped following her. The Secretary disputes that Bredemeier actually complained to management about Kolbe's behavior prior to meeting with Marsh in May 2013 and contends that Marsh properly handled the matter by speaking to Kolbe and concluding that his conduct did not amount to harassment. Because this is the Secretary's motion for summary judgment, however, the Court must view the evidence in the light most favorable to Bredemeier and draw all reasonable inferences in her favor. A reasonable factfinder could choose to believe Bredemeier's account and conclude that the VA was, in fact, negligent in remedying the harassment alleged in this case. Accordingly, the Court denies the Secretary's motion for summary judgment on count 1.

**B.    Failure to accommodate claim (count 2)**

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency. . . ." 29 U.S.C. § 794(a). Rehabilitation Act employment discrimination claims are generally analyzed under the same standards applicable to claims brought under Title I of the Americans with Disabilities Act. *See id.* § 794(d); *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013). To prevail on a failure to accommodate claim brought under the Rehabilitation Act, Bredemeier must show that (1) she is a qualified individual with a disability; (2) her employer was aware of her disability; and (3) her employer failed to reasonably accommodate her disability. *Brumfield*, 735 F.3d at 631.

The Secretary does not dispute either that Bredemeier is a qualified individual with a disability or that the VA was aware of her disability. Instead, the Secretary argues that no reasonable jury could find that the VA failed to reasonably accommodate her because from 2012 through 2016, it addressed Bredemeier's numerous requests for accommodation by providing her with new workstations, ergonomic evaluations, new dictation software, new phones and headsets, software training, and workstation relocations, among other things. For her part, Bredemeier contends that it is undisputed that the VA took her dictation software away from her in September 2011 and failed to ensure that it was operational at any point after that, despite her repeated requests for help. Bredemeier argues that she is entitled to summary judgment on her failure to accommodate claim for that reason alone.

As an initial matter, there appears to be a genuine factual dispute regarding whether Bredemeier had working dictation software at any point after September 2011. Although internal e-mails indicate that the VA installed such software on Bredemeier's computer, arranged for her to receive training on it, and attempted to ensure that it was working properly on numerous occasions since 2011, the e-mails do not demonstrate that Bredemeier has actually been able to successfully use the software since then. Bredemeier has stated that she has not had fully functioning voice recognition software since the VA took it from her in September 2011, and a reasonable jury could believe her testimony on this point. March 8, 2018 Bredemeier Decl. ¶ 30.

Viewing the evidence in the light most favorable to Bredemeier, a reasonable jury could conclude that she needed the dictation software to perform her job duties in light of her disability and that the VA's prolonged failure to get the dictation software up and

running again despite repeated requests and numerous e-mails back and forth about the problem constitutes a failure to reasonably accommodate her disability. On the other hand, viewing the evidence in the light most favorable to the VA, a reasonable jury could also conclude that—dictation software problems aside—the VA reasonably accommodated Bredemeier by providing her with numerous other accommodations, including transitional duty assignments, a new ergonomically designed workstation, software training, and new headsets. *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) ("It is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests.").

Genuine factual disputes regarding whether the VA has failed to reasonably accommodate Bredemeier's disability therefore preclude a grant of summary judgment for either side. The Court must nonetheless address one final point raised by the Secretary. The Secretary contends that Bredemeier failed to timely seek EEO counseling for any failure to accommodate that occurred more than 45 days prior to the May 8, 2013 initiation of EEO counseling and that she failed to exhaust administrative remedies with respect to any failure to accommodate that occurred after the May 2013 failure to accommodate referenced in Bredemeier's June 2013 EEO complaint. A failure to accommodate claim may be based on a discrete act by an employer, such as express denial of an employee's accommodation request. *See Rand v. Geithner*, 609 F. Supp. 2d 97, 101 (D.D.C. 2009) (denial of plaintiff's accommodation request was a discrete act). On the other hand, in cases such as this one, the failure to accommodate may not become apparent all at once, but rather becomes evident over the course of

time.  *See O'Toole v. Acosta*, No. 14-CV-2467, 2018 WL 1469045, at *14 (N.D. Ill. Mar.

26, 2018) ("[R]easonable accommodation is a process, not a one-off event . . . .")

(internal quotation marks and citation omitted); *Sutton v. Potter*, No. 02 C 2702, 2004

WL 603477, at *6 (N.D. Ill. Mar. 22, 2004) ("[T]here was no definitive temporal marker

distinguishing for Sutton at what moment USPS' failure to accommodate ceased to

constitute the normal and expected administrative delay or red-tape associated with the

process of reasonably accommodating, and started characterizing disability

discrimination instead.").

Neither party does a good job of developing the exhaustion issue or, for that

matter, explaining the significance of the May 12, 2013 date of the "denial" of

Bredemeier's request for an accommodation referenced in the June 2013 EEO

complaint.  In light of the numerous e-mails exchanged between Bredemeier and

various VA employees during the period from 2011 through May 2013 (and beyond),

there is a reasonable basis to find that Bredemeier believed that the VA was still in the

process of attempting to accommodate her disability.  She may have simply decided in

May 2013 that the lack of progress on that front effectively constituted a denial of her

request for accommodations and that it was time to file an EEO complaint.  Moreover,

Bredemeier's allegations regarding the VA's post-May 2013 failure to accommodate her

appear to pertain to the same violation referenced in her EEO complaint (namely, the

VA's failure to ensure that her dictation software was installed and functioning properly).

The Court concludes that the Secretary has not shown as a matter of law that

Bredemeier failed to exhaust administrative remedies.    Ultimately, however, given the

lack of clarity on a number of these points—and the parties' failure to adequately

develop them—the Court concludes that this is an issue that must be further developed and decided by the Court before trial.

## C.    Discrimination, hostile work environment, and retaliation claims (count 3)

To make out a prima facie case of discrimination under the Rehabilitation Act, Bredemeier must show "(1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability." *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). And to prevail on a retaliation claim, Bredemeier must produce evidence showing that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018); *Twisdale v. Snow*, 325 F.3d 950, 952 (7th Cir. 2003) (Title VII, Rehabilitation Act, and ADA retaliation provisions are materially identical).

Bredemeier alleges that during a July 2012 mediation regarding her requests for accommodations for her disability, Chief of Pharmacy Lynx "yelled that the pharmacy was a place in need of young people who could use both hands who were physically able to handle the job." March 3, 2018 Bredemeier Decl. ¶ 56. She further alleges that Lynx discriminated and retaliated against her after the July 2012 mediation by scrutinizing her bathroom breaks and phone calls, "hovering over her while she was working," and filing an April 2013 police report accusing her of theft.[6] Pl.'s Resp. to

---

[6] The Secretary's motion for summary judgment also addresses certain additional claims that Bredemeier initially made in her EEO complaint, namely, the 2012 issuance of a letter of inquiry and the removal of her billing duties. Because Bredemeier's

Def.'s Mot. for Summ. J. at 15.  Bredemeier has stated that she believes Lynx did these things to drive her out of the department, but that, of course, is not dispositive.

The Secretary does not dispute that Bredemeier is a qualified person with a disability or that she engaged in protected activity.  Rather, the Secretary contends that (1) the complained of acts are not actionable adverse employment actions and (2) Bredemeier cannot establish the requisite causal link between her disability or protected activity and the alleged adverse employment actions.  Although the Secretary uses the *McDonnell Douglas* burden-shifting framework to frame this last argument in terms of lack of a similarly-situated comparator and inability to show pretext, the Court declines to do the same in its analysis because that is not the approach that Bredemeier has elected to take in this case.  What matters is whether the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the proscribed factor caused the adverse employment action in question.  *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Reid v. Wal-Mart Stores, Inc.*, 274 F. Supp. 3d 817, 822 (N.D. Ill. 2017).

To qualify as an adverse employment action for purposes of a discrimination claim, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities"; it must materially alter the terms or conditions of employment to be actionable.  *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (citation omitted).  As an initial matter, the Court agrees with the Secretary that Lynx's increased scrutiny of Bredemeier's workspace, bathroom breaks, and phone calls cannot form the

response makes no mention of either of these claims, the Court concludes she has elected not to pursue them.

basis of a discrimination claim because such conduct does not constitute an actionable adverse employment action. There is no evidence that this increased scrutiny resulted in any disciplinary action or had any other effect on the terms or conditions of Bredemeier's employment. *See id.* ("[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a discrimination suit.") (internal quotation marks and citation omitted); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions."). In *Tart v. Illinois Power Co.*, 366 F.3d 461 (7th Cir. 2004), the case Bredemeier cites for the proposition that increased scrutiny after protected activity may constitute an adverse action, the Court did not conclude that increased scrutiny was an adverse employment action in and of itself. In that case, the increased scrutiny led to the plaintiffs being suspended, having their overtime pay taken away, and being reassigned. *Id.* at 467.

The standard is lower for retaliation claims: to be actionable, the alleged adverse employment action need only be something that might dissuade a reasonable worker from engaging in protected activity. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Freelain v. Village of Oak Park*, 888 F.3d 895, 901-02 (7th Cir. 2018). Nonetheless, no reasonable factfinder could conclude that the increased scrutiny Bredemeier describes would dissuade a reasonable worker from asserting her right to a reasonable accommodation. And it certainly would not constitute harassment that is severe or pervasive enough to create a hostile work environment. *See supra* Section A. The Court therefore finds, pursuant to Federal Rule of Civil Procedure 56(g),

that the increased scrutiny described by Bredemeier is not an actionable adverse employment action for purposes of a discrimination or retaliation claim.

On the other hand, viewing the evidence in the light most favorable to Bredemeier, the Court cannot say that the April 2013 filing of an allegedly false police report against her did not constitute an adverse employment action. Although no charges were ultimately brought against Bredemeier, she did become the target of an investigation, and she alleges that it affected her ability to obtain a position outside the pharmacy department. *See* March 8, 2018 Bredemeier Decl. ¶¶ 69-70.

The Secretary argues that even if Bredemeier is able to make out a prima facie case of discrimination or retaliation based on the filing of the police report, summary judgment is nonetheless warranted because she cannot prove that Lynx filed the report for discriminatory or retaliatory—rather than legitimate—reasons. Specifically, the Secretary has explained that the VA interviewed Bredemeier as part of its investigation into the medication mix-up because the medication at issue was found at her father-in-law's house and Bredemeier was known to pick up his medication from the VA pharmacy. As Bredemeier points out, however, she was not merely "interviewed" during the course of the investigation—she was named as the only suspect. *See* Pl.'s Resp. to Def.'s 56.1 Statement, Ex. 12 at 1 (noting that Bredemeier is suspected of "taking pharmaceuticals from the pharmacy without proper authorization"). Moreover, a reasonable factfinder viewing the facts in the light most favorable to Bredemeier could infer both discriminatory and retaliatory animus from Lynx's earlier statement, during the July 2012 mediation, that "the pharmacy was a place in need of young people who could use both hands who were physically able to handle the job." March 3, 2018

Bredemeier Decl. ¶ 56.

On this record, although no reasonable jury could conclude that Lynx created a hostile work environment for Bredemeier, the Court cannot say that no reasonable jury could find for Bredemeier on her discrimination and retaliation claims under the Rehabilitation Act. The Court therefore denies the Secretary's motion for summary judgment on count 3, except insofar as Bredemeier claims a hostile work environment in violation of the Rehabilitation Act.

## Conclusion

For the foregoing reasons, the Court denies Bredemeier's motion for summary judgment [dkt. no. 60] and denies the Secretary's motion for summary judgment on counts 1-3, except it grants the motion insofar as count 3 asserts a hostile work environment claim and claims based on Lynx's increased scrutiny of Bredemeier. [dkt. no. 64]. The case is set for a status hearing on August 13, 2018 at 9:30 a.m. for the purpose of setting a trial date and discussing the possibility of settlement. The parties should be prepared to further discuss the exhaustion issue at that time. Department of Veterans Affairs Secretary Robert Wilkie is substituted as the defendant pursuant to Federal Rule of Civil Procedure 25(d).

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 3, 2018